**UNITED STATES of America**

v.

**Mark ROLLINSON, et al., Edmund S. Barnett, Appellant.**

**UNITED STATES of America**

v.

**Mark ROLLINSON, et al., Appellant, Edmund S. Barnett, et al.**

**Nos. 86–5173, 86–5174.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 20, 1988.

Decided Feb. 3, 1989.

**1464**

Clark S. Kall, Alexandria, Va., for appellants in 86–5173 and 86–5174.

Paul J. Pantano, Jr., John R. Burns and Brian D. Alprin, Washington, D.C., were on the brief for appellant in 86–5173.

Claire M. Whitaker, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., were on the brief, for appellee. Mary Coster Williams, Asst. U.S. Atty., Washington, D.C., also entered an appearance, for appellee.

Before WALD, Chief Judge, MIKVA and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Defendants, Edmund S. Barnett, Sr., and Mark Rollinson, appeal from the District Court's grant of summary judgment in favor of the United States for the unpaid principal and interest due and payable on a Small Business Administration ("SBA") loan secured by loan guarantees they executed. *United States v. Rollinson*, 629 F.Supp. 581 (D.D.C.1986). In granting the government's motion, the Court rejected appellants' arguments that the claim was time-barred and that certain deferrals and alleged modifications of the original contract released them as guarantors. *Id.* at 583–86. Appellants renew these contentions before this Court and additionally argue that the District Court erroneously granted summary judgment, as there were outstanding issues of material fact. We disagree and affirm, although for reasons assigned as an alternative theory by the District Court.

## I. BACKGROUND

On October 16, 1973, Sounds Reasonable, Inc. ("SRI" or "the Company"), a now defunct District of Columbia corporation which owned and operated a recording studio, produced music, and performed other creative audio services, entered into a loan agreement with the District of Columbia National Bank of Washington ("Bank"). The loan of $120,000 at eleven percent annual interest was secured in part by a promissory note payable, both principal and interest, in monthly installments of $2,055 until the date of maturity, October 16, 1980. SBA guaranteed ninety percent of the loan pursuant to a Loan Guarantee

Agreement it had entered into with the Bank that year. In order to induce the Bank loan and the SBA guarantee, the appellants and three other individuals personally guaranteed the loan's repayment.[1]

Contrary to the expectations of all involved, SRI was unable to meet its obligations. According to appellant Rollinson's affidavit, SRI was in arrears "within a few months after the loan was made." Joint Appendix ("J.A.") D7. Bank records reflect delinquencies in repayment as early as September, 1974. J.A. C151. By November 11, 1974, SBA had been made aware that "[t]he company is in bad financial shape and according to the bank, the future looks bleak." J.A. E39. By its terms, SBA's Loan Guaranty Agreement required SBA approval of any "alteration in the terms" of the loan. J.A. G61. And, pursuant to the Bank's request, on November 12, 1974, SBA approved the first of at least five deferrals of principal payments granted SRI. J.A. E40.

Over the next three years, SRI's financial woes continued. On April 1, 1977, after a series of deferrals and missed payments, the Bank alerted SRI and the loan's guarantors to the Company's renewed delinquencies and expressed its intent to demand payment in full under the acceleration clauses of the note and guaranty agreements unless certain corrective steps were taken. J.A. C165–67. When the measures were not forthcoming, the Bank made a similar demand on December 22 of the same year. Because of SRI's continuing failure to meet its obligations as they came due, on March 30, 1978, the Bank made demand on SBA for payment of the guaranteed portion of the loan. The note was assigned to SBA on April 11, 1978. J.A. C175.

Although it appears that SRI had not made a single payment since September, 1977, it and SBA entered into a modification agreement on February 5, 1979, whereby SRI's past installments were deferred, the maturity date of the note was extended by nine years (to October 16, 1989), and the monthly installments were reduced by approximately one-third (to $1,364 per month). J.A. E51. SRI made its only payment under the new arrangement in March, 1979; consequently, on October 25, 1979, SBA made demand upon the note's guarantors for $99,100 in principal and $18,844 in interest. J.A. A17–20. The demand was not honored, and on November 6, 1984, SBA filed this action.

## II. DISCUSSION

According to appellants, the District Court erred in granting the government's motion for summary judgment because "[a] viable issue of fact [exists] as to when the limitations period began." Brief for Appellant Barnett at 16.

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) on demonstration "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It is the moving party who bears the onus of establishing his entitlement to summary judgment, and it takes but little evidence to create an issue for trial. *See Kozup v. Georgetown University*, 851 F.2d 437 (D.C.Cir.1988); *Abraham v. Graphic Arts Int'l Union*, 660 F.2d 811 (D.C.Cir.1981). It is axiomatic that "the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The substantive law at issue here, the statute of limitation of actions brought by the United States and founded upon a contract, 28 U.S.C. § 2415(a) (Supp. IV 1986), requires that the action be "filed within six years after the right of action accrues … *Provided*, That in the event of later partial payment of written acknowledgment of debt, the right of action shall be deemed to accrue again at the time of each such payment or acknowledgement[.]" There is no contention that § 2415(a) does not apply; rather, the controversy concerns the import of its terms.

---

1. Of the three others who jointly and severally guaranteed the debt, one is dead, one has settled with the government, and the whereabouts of the third is unknown.

*When did SBA's right of action accrue?*

The parties challenge the District Court's choice of the triggering mechanism for the running of the statute, which, according to the Court, was the date " 'when the claim first could be sued upon, rather than within six years of when the [g]overnment acquired the claim.' " 629 F.Supp. at 583 (quoting *United States v. Cardinal*, 452 F.Supp. 542, 545 (D.Vt.1978)). In deciding when "the claim first could be sued upon," the District Court relied heavily on the fact that the guaranties at issue provide that the " '[h]older is authorized to declare all or any part of the indebtedness immediately due and payable upon the happening of any of the following events: (1) Failure to pay any part of the indebtedness when due.' " *Id.* at 584. The Court noted that this language vests authority in the holder to determine when the debtor was in default. *Id.* Relying primarily on authority from outside this Circuit, the Court reasoned that because "the right to accelerate the installment payments was at the option of the holder, the cause of action was not perfected until a demand was made." *Id.* Thus, it accepted the government's argument that because SBA made demand on October 25, 1979, its right of action accrued on that date, and because suit was brought within six years (on November 6, 1984), the action was timely filed. *Id.*

Appellant Rollinson contends that the Court erred in failing to recognize that the claim could have been pursued much sooner than it was, as "SRI was in default practically from the start back in 1973." Brief for Appellant Rollinson at 23. Appellants rely on authority from this Court that when demand is necessary to commence the running of the statute of limitations, "a party is not at liberty to stave off operation of the statute inordinately by failing to make demand; when statutorily unstipulated, the time for demand is ordinarily a reasonable time." *Nyhus v. Travel Management Corp.*, 466 F.2d 440, 452–53 (D.C.Cir.1972) (footnote omitted). Thus, appellants argue, because SRI was in arrears, and because their understanding was that the note would be declared in default at the first sign of trouble, the Bank "wait-ed unreasonably too long" in making its demand. Brief for Appellant Rollinson at 23. At the very least, they contend, a triable issue exists as to the reasonableness of the holders' delay.

The District Court recognized that *Nyhus* presents a holder of a note from delaying unreasonably in making its demand, but contrary to appellants' contentions, the Court found that any delay by the Bank and SBA could "hardly be characterized as unreasonable," 629 F.Supp. at 584 n. 2, concluding that it would be "simply unreasonable to expect the SBA to call in loans at the first sign of trouble." *Id.* at 585. Moreover, "[e]ven if the SBA's failure to make demand for six months following [the April 16, 1979] default was unreasonable, the Court would still be compelled to conclude that the agency's right of action accrued on or about April 16, 1979," the date of SRI's first missed payment under the modified repayment schedule. *Id.* at 584 n. 2. For the reasons we discuss below, it appears that April 16, 1979, would be the earliest date the statute could have begun to run.

Appellant Barnett alternatively contends that the cause of action accrued "when the government suffer[ed] its loss," that is, when SBA reimbursed the Bank for its loss on April 11, 1978. Reply Brief for Appellant Barnett at 2. Substantial authority can be found for this position. In *United States (SBA) v. Corsino*, 648 F.Supp. 454 (D.P.R.1986), for example, the court held that the statute of limitations begins to run against SBA "at the time the government reimburses the lender for its loss arising from borrower's default." *Id.* at 456. *See also United States v. Baker*, 681 F.Supp. 750 (M.D.Ala.1987) (same); *FDIC v. Hinkson*, 848 F.2d 432, 435 (3d Cir.1988); *FDIC v. Fonseca*, 795 F.2d 1102, 1108–09 (1st Cir.1986); *United States v. Klotz*, 599 F.Supp. 301, 302 (D.Conn.1984); *FDIC v. Cardona*, 723 F.2d 132, 134 (1st Cir.1983) (suggesting in dictum that statute begins to run when FDIC acquires claim).

Some courts have reached the same conclusion on the basis of common-law suretyship principles. In *United States v. Tille-*

*raas,* 538 F.Supp. 1 (N.D.Ohio 1981), for example, the district court held that the government's cause of action against the guarantor of a defaulted student loan accrued neither on default by the borrower nor on the acceleration of the unpaid balance, but, "under a suretyship theory the cause of action accrues on the date the surety pays the principal's debt." *Id.* at 6. *See also United States v. Frisk,* 675 F.2d 1079 (9th Cir.1982); *United States v. Kendrick,* 554 F.Supp. 121 (E.D.Ark.1982).

While we are not unimpressed with the reasoning in these cases, we see no reason why our previous pronouncement in *Nyhus* should not guide our decision here. Certainly, the guaranties at issue here are ones "[w]here a demand [was] necessary to perfect a cause of action." *Nyhus,* 466 F.2d at 452. And, while we have never had occasion to apply *Nyhus* to a situation where the government sought collection on a personal guaranty, numerous other courts have applied the same rule in such a context.

*United States v. Cardinal,* 452 F.Supp. 542 (D.Vt.1978), involved a defaulted home loan insured by the Federal Housing Administration. The court rejected both the government's contention that its right accrued when it was assigned the loan from the bank and appellant's argument that the government's right accrued when she first defaulted. Rather, *Cardinal* held that the government's right accrued under section 2415(a) when its assignor, the bank, originally invoked the note's acceleration clause and demanded payment of its balance. *Id.* at 547. The court noted that the acceleration clause permitted the lender to treat the entire debt as due upon the failure to make a payment. Until accelerated, however, the maturity date remained unchanged. Thus, the District Court concluded that because acceleration was optional on the part of the holder, " 'affirmative action ... must be taken to make it known to the debtor that he has exercised his option to accelerate.' " *Id.* at 547 (quoting *Moresi v. Far West Services, Inc.,* 291 F.Supp. 586, 588 (D.Hawaii 1968)).

While *Cardinal* has been criticized for incorrectly "assum[ing] that the only theory of recovery available to the government is an action on the underlying obligation, as an assignee of the note from the original lending institution," *Tilleraas,* 538 F.Supp. at 5, we note that at least two of our sister circuits have applied similar rules when the government has acted under acceleration clauses. *See United States v. Gilmore,* 698 F.2d 1095, 1097 (10th Cir.1983); *United States v. Alessi,* 599 F.2d 513 (2d Cir.1979) (per curiam); *see also United States v. Feterl,* 849 F.2d 354, 356–57 (8th Cir.1988) (correctly noting differences in language between *Gilmore* and *Cardinal,* but nevertheless concluding that under either case, "a lender must, at least, have invoked the acceleration clause in the loan agreement" before the limitations period would begin).

Indeed, the majority of cases where SBA has acted under a note's acceleration clause and has sought collection against the loan's personal guarantors have held that its right of action accrues under section 2415(a) only after acceleration. *See Gilmore,* 698 F.2d at 1097 ("SBA notified the defendants that it exercised the acceleration clause.... The cause of action then accrued."); *United States v. Frey,* 708 F.Supp. 310 (D.Kan.1988) ("earliest point at which the statute began to run" was date of acceleration and demand); *United States v. Hanson,* 649 F.Supp. 100, 105 (D.Me.1985) (holding right accrued "when the SBA accelerated the note and demanded payment by the guarantors"); *cf. Curry v. United States (SBA),* 679 F.Supp. 966, 970 (N.D. Cal.1987) (relying on *Nyhus* and holding right accrued "at least by the date on which a reasonable person would have declared the note in default"); *United States v. Kurtz,* 525 F.Supp. 734, 739 n. 10 (E.D. Pa.1981), *aff'd without opinion,* 688 F.2d 827 (3d Cir.), *cert. denied,* 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982) ("Normally, the cause of action would not accrue until the guarantor dishonored the demand.").

In short, we see no reason why the *Cardinal–Nyhus* line of cases should not govern in the present case. However, we need

not decide this question, for as we explain below, whenever the statute originally began to run, it ceased running under the terms of section 2415(a)'s first proviso when SRI and SBA entered into their February, 1979, modification agreement. Since this modification occurred within six years of the time this action was filed, we need not decide whether the District Court erred by determining that under *Cardinal* and *Nyhus* SBA acted reasonably in delaying demand before that time.[2]

*Effect of 1979 modification*

■ In providing for a six-year period of limitations, section 2415(a) includes the following proviso: "in the event of later partial payment or written acknowledgment of debt, the right of action shall be deemed to accrue again at the time of each such payment or acknowledgment." The legislative history of the section confirms that the proviso was designed to codify "a familiar principle of law," which is that "[t]he obligation of a debt will continue where a debtor has acknowledged the debt and indicated his willingness to discharge the obligation." S.Rep. No. 1328, 89th Cong., 2d Sess. 3 (1966), *reprinted in* 1966 U.S.Code Cong. & Admin.News 2502, 2504.

Lacking any authority from this Circuit to aid in our interpretation of the proviso, we look to the precepts of common-law contract law and to the somewhat sparse pronouncements on this question from our sister circuits.

Generally, in the common law, where a debtor unequivocally acknowledges and evidences a sufficient commitment to pay a preexisting debt, the law will treat the acknowledgment as a new promise to pay. *See* 1A A. Corbin, *Corbin on Contracts* § 216 (1963) ("an acknowledgment that a sum of money is actually due, if made without any accompanying denial of willingness, justifies the inference of a promise to pay") (footnote omitted). The second promise, implied from the acknowledgment, is said to have been supported by either "past" or "moral" consideration. The acknowledgment may also have the effect of lifting the bar of the statute of limitations, thereby extending the time for enforcement to the full limitations period commencing with the new promise. *See id.* § 214 (the debtor's promise "is supported by the 'past consideration.' Though the debtor was protected by a legal bar, he is regarded as still under a moral obligation to pay the barred debt.") (footnote omitted); *see also Mattingly v. Boyd*, 61 U.S. (20 How.) 128, 131, 15 L.Ed. 845 (1858); *United States v. Glens Falls Ins. Co.*, 546 F.Supp. 643, 645 (N.D.N.Y.1982).

An entirely different question is raised where, as here, it must be ascertained whether the debtor's acknowledgment can be the basis for tolling the statute as to the debt's guarantors. If an enacting section 2415(a), Congress contemplated the proviso's application to those secondarily liable on a debt, it did not express this intent. Accordingly, we consult other sources for the law.

There is substantial authority for the proposition that partial payments on a note by a principal debtor do not toll the statute as to the note's guarantors. Leading and trusted authorities inform us that this is, in fact, the general rule. *See, e.g.*, 38 Am. Jur.2d *Guaranty* § 121 (1968) ("It has generally been held that a payment by the principal debtor does not have the effect of tolling the statute of limitations as to the guarantor.") (citations omitted); Annotation, *Acknowledgment, new promise, or payment by principal as tolling Statute of Limitations as against guarantor* ("Annotation"), 84 A.L.R. 729 (1933) ("In most of the jurisdictions ... a payment by a principal debtor will not operate to toll the Statute of Limitations as to a guarantor of the debt."). The rule has never been followed universally or in its pristine form.

---

**2.** In light of our holding, we need not and do not express an opinion as to whether the Bank and SBA are treated as one in determining when SBA's cause of action originally accrued. *Compare United States v. Cardinal*, 452 F.Supp. at 547 (derivative claim asserted by government accrues when claim first actionable, whether or not government is holder at that time) and *United States v. Blackmon*, 496 F.Supp. 1250 (E.D. Ark.1980) (same) *with FDIC v. Hinkson*, 848 F.2d at 435 (criticizing *Cardinal*).

Some jurisdictions, for example, differentiate between debts that are barred by the statute when the new promise is made and those that are not, holding that a new promise will renew a claim against guarantors only in the case of the latter. *See* 51 Am.Jur.2d *Limitation of Actions* § 352 (1970) ("Generally speaking, a principal's subsequent acknowledgment or new promise does not revive the liability, upon a barred obligation, of a guarantor or surety. On the other hand, in some jurisdictions it seems that a promise made by the principal before the bar has attached will suspend the running of the statute as to the surety, but that payments or promises made afterward will not revive the claim."), and cases cited therein. Some jurisdictions, however, have rejected the rule in its entirety. *See, e.g., Conn v. Atkinson*, 227 Ky. 594, 13 S.W.2d 759 (1929) (partial payments toll statute as against debtor and guarantors); *Hooper v. Hooper*, 81 Md. 155, 31 A. 508, 511 (1895) ("the liability of the guarantors, being coextensive with [that of the principal], was [treated equally] by the statute").

The reason for treating the principal debtor and the guarantor differently upon a subsequent promise or acknowledgment by the debtor is straightforward and sensible: A guarantor's consent to the debtor's future conduct may not be presumed merely on the basis of the original guarantee. Thus,

> it cannot, on principle, be asserted that [an agency] relationship exists between the maker and guarantor of a promissory note, or that because A has guaranteed the performance of the contract of B, A has, by such guaranty, created B his agent, authorized, as such, to make other contracts binding upon A[.]

Annotation, 84 A.L.R. 729, 730 (1933) (quoting *Aiken v. Nance*, 28 Haw. 275 (1925)). This being the basis of the rule, one would expect that the parties could by agreement alter its general effect. This is indeed the case. Thus, where the guarantor undertakes the responsibility of guarantying the principal's future undertakings, he may be held liable as a guarantor even if he did not specifically agree to guarantee a particular loan. *See, e.g., Valley Nat'l Bank of Ari-*

*zona v. Foreign Car Rental, Inc.*, 157 Colo. 545, 549, 404 P.2d 272, 274–75 (1965) ("The all-inclusive language covering loans then existing or thereafter to be made, or any renewals thereof, required no further communication from the guarantors.").

Moreover, where the guaranty agreement grants power to the principal debtor to extend or renew the debt, courts have held that the statute is tolled as to both the principal debtor and the guarantor by such a new agreement. *Republic Nat'l Bank of Dallas v. Meridian Properties, Inc.*, 530 F.Supp. 169 (D.Colo.1982), is such a case. There, the district court was confronted with an agreement reached by the principal debtor (Meridian Properties) and its creditors that reinstituted an accelerated loan's original repayment schedule. Plaintiff bank, the holder of the note, contended that the agreement "re-set the statute of limitations" as to the guarantors of the note in question. The court agreed, emphasizing that the original guaranty agreement permitted the principal debtor to "renew or extend any obligations of Meridian and/or of co-guarantors." Consequently, it held that

> [b]ecause defendant ... was a continuing guarantor for Meridian, for its new obligations and for its renewals and extensions, he was bound by the subsequent settlement agreement, even though he did not personally sign it. He therefore cannot assert a statute of limitations defense that totally ignores the settlement agreement.

*Id.* at 172 (footnote omitted).

Conversely, where the relevant agreement provides for extensions or renewal of the note, the statute will not be tolled as to the guarantors by mere partial payment by the debtor. *Wellington Nat'l Bank v. Thomson*, 9 Kan.App. 667, 59 P. 178 (1899), made this very point nearly a century ago. There the Kansas Court of Appeals construed a promissory note which extended to the holder the power to extend the note without notice. The court was unwilling to hold that the statute of limitations could be suspended as to a surety by the debtors' payments of interest upon the note: "The

word 'extension,' used [in the note], must be understood as meaning an actual extension of the time of payment.... The act of other signers of the note in paying interest already accrued, or making part payment of the principal, did not suspend the running of the statute, so far as [the surety] was concerned." 59 P. at 178. *Cf. Elk Horn Bank & Trust Co. v. Spraggins,* 182 Ark. 27, 30 S.W.2d 858, 859 (1930) (distinguishing the effect of partial payment and extension or renewal in the context of a vendors' lien).

To summarize, the general rule—that changes by the principals will not affect the running of the statute of limitations against a guarantor—presumes the absence of consent to the changes. Thus, where a guaranty does not vest in the holder the right to extend or modify the note, such conduct will not affect the running of the statute against the guarantor. Likewise, where a guaranty agreement permits extension or renewal, mere partial payment does not affect the guarantor. The general rule will, however, yield when an agreement vests these powers and when the powers are exercised. This analysis helps explain the Tenth Circuit's decision in *FDIC v. Petersen,* 770 F.2d 141 (10th Cir. 1985), upon which appellants rely.

In *Petersen,* three individuals guaranteed a loan to Meridian Properties, and by the terms of the guaranty agreements expressly consented to any future extensions or renewals of the note. FDIC acquired the note, and because the borrower had defaulted, sued to enforce the guaranties. The guarantors contended that the claim was time-barred because the suit was filed six years and three months after the note matured. FDIC argued that because Meridian's accountant had sent the lending bank a financial statement listing the loan as a liability, Meridian had "acknowledged" the debt within the meaning of section 2415(a), thereby suspending the statute of limitations as to the guarantors. After assuming that the statement constituted an acknowledgment under section 2415(a), the district court concluded that the acknowledgment did not toll the statute against the guarantors. It rejected as "sophistry"

FDIC's argument that because the guaranties vested in Meridian the right to extend or renew the note, the acknowledgment constituted such a renewal or extension. *FDIC v. Petersen,* 565 F.Supp. 1007, 1010–11 (D.Colo.1983).

After stating that the question presented "an issue of first impression in federal courts," 770 F.2d at 143, the Tenth Circuit affirmed. In reaching its decision, the Court was careful to distinguish extension or renewal—powers that the guaranty agreements vested in Meridian—from mere acknowledgment of the debt:

> FDIC argues that the guaranties permitted the extension or renewal of the note and Meridian's acknowledgment of the debt constituted such a renewal to which the guarantors gave prior consent by signing the guaranties. The district court characterized the argument as "sophistry." ... We agree. Extension or renewal of a note refers to a binding agreement supported by consideration to postpone the maturity date of a note or to replace it with a new contract. *Elk Horn Bank & Trust Co. v. Spraggins* ...; *Wellington National Bank v. Thomson....* Acknowledgment or part payment of the debt does not constitute a new agreement. It only suspends the running of the statute of limitations against the party making such acknowledgment or partial payment.

*Petersen,* 770 F.2d at 143 (citations omitted). In light of the foregoing, appellants' reliance on the case for the proposition that a debtor's "modification ha[s] no effect on the running of the statute of limitations as to [guarantors]," Reply Brief for Appellant Rollinson at 12, is clearly misplaced. To the contrary, the Court indicated that the limitations period continued to run against the guarantors precisely because there was no modification. The Court carefully differentiated a renewal or extension from a mere acknowledgment. Had there been an "agreement supported by consideration to postpone the maturity date of the note," the clear implication is that the statute would have accrued again against the guarantors. This interpretation is buttressed—

if not confirmed—by the Court's reliance on *Spraggins* and *Thomson.*

In contrast, the 1979 agreement at issue here, entitled "Modification of Promissory Note," provided in part that

the terms and conditions of Borrower's Note, as above described, are hereby modified as follows:

(1) That the principal portion of installments due 9/16/77 through 2/16/79 be deferred to the maturity of the Note.

(2) That the monthly installments of $2,055.00 be reduced to $1,364.00 per month effective 3/16/79.

(3) That the maturity of the note be extended from 10–16–80 to 10–16–89.

It is further understood and agreed that all other terms, conditions and co[ ]venants of the foresaid Note, not otherwise modified hereby, shall be and remain the same, and that this Agreement, when executed by the parties hereto, shall be attached to and become a part of the original Note, and shall have the same force and effect as if the terms and conditions hereof were originally incorporated in the Note, prior to its execution.

J.A. E51.

The 1979 refinancing transaction did not constitute a mere acknowledgment or partial payment, which under our analysis would not have restarted the statute of limitations with respect to the guarantors. Rather, it amounted to an "agreement supported by consideration to postpone the maturity date of a note." *Petersen,* 770 F.2d at 143. The modification agreement postponed the maturity date nine years, meeting one of the chief conditions described in *Petersen.* The parties also noted that the refinancing was "mutually desirable, beneficial and argee[a]ble, and that they acted "in consideration of the mutual benefits inuring to each other." J.A. E51. This is an indication that there was ample consideration for the transaction.

A recent decision from the same circuit is not to the contrary, and, indeed, is entirely consistent with this analysis. In *FDIC v. Galloway,* 856 F.2d 112 (10th Cir.1988), the court had before it guaranty agreements which, while continuing in nature, did not include a clause permitting the principals to extend or modify the original note. The FDIC contended that because the original loan was extended in exchange for partial payments on the original debt by the borrower, the statute of limitations was tolled as to the guarantors of the original note. Applying *Petersen,* the court disagreed. While the relevant agreements guaranteed "all existing and future indebtedness and liability of every kind," the court could not agree that the lender's extensions of the maturity dates qualified as the sort of "new and separate debts" contemplated by the agreements. *Id.* at 117.

In the present case, as in *Meridian Properties* and *Petersen,* and quite unlike the guaranties in *Galloway,* the guaranties provided in no uncertain terms that SRI was permitted to modify, extend, or renew the original note:

The Undersigned hereby grants to Lender full power, in its uncontrolled discretion ... to deal in any manner with the Liabilities and the collateral, *including ... [the power to ] modify or otherwise change any terms* of all or any part of the Liabilities or the rate of interest thereon (but not to increase the principal amount of the note of the Debtor to Lender), *to grant any extension or renewal thereof* and any other indulgence with respect thereto, and to effect any release, compromise or settlement with respect thereto[.]

J.A. A6 (emphasis added). That it was SBA rather than the lender Bank that entered into the modification agreement with SRI is of no import. As assignee of the Note, it acquired the right.

It is also noteworthy that in this case, unlike *Galloway,* the guaranties provided that the guarantors would, upon default, be required to pay "in like manner as if such amount constituted the[ir] direct and primary obligation." J.A. A6. Under such a clause, the guarantors' derivative liability more closely approximates that of the primary debtor.

Appellants seek to avoid the clear import of the above-quoted language by pointing

to a clause in the guaranties which makes the power to modify "subject to the provisions of any agreement between the Debtor or any other party and Lender at the time in force." *Id.* While appellants argue that they had agreed with the principals that their consent was needed to modify the note, no substantial evidence to this effect was before the District Court. It is true that Rollinson's affidavit stated that on at least five occasions his consent to certain alleged modification agreements was requested. There was also evidence before the District Court that the Bank corresponded with the guarantors on several occasions, seeking their consent to the principal deferrals.

However, the record is bereft of any specific fact demonstrating there was any such agreement. Careful inspection of the affidavits to which appellants direct our attention reveals no assertion that such an agreement existed. To the contrary, appellants' affidavits are silent on the point. *See* J.A. C16–18, D7–8. The unsigned documents that appellants claim to be copies of executed modification and extension agreements likewise are of no avail. Even if we were to assume that they were executed, they do not establish that there was a prior agreement to require the guarantors' consent. As for appellants' contention that the Bank "would not have ... wasted so much time and energy" securing their consent absent a contractual obligation to do so, Brief for Appellant Rollinson at 34, this sort of hypothesizing is not sufficient to withstand a properly supported motion for summary judgment. While the nonmoving party is entitled to every reasonable inference, he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

*Modifications and deferrals as effecting release of guarantors*

■ Having concluded as we have that the running of the statute ceased with the extension in 1979, we address one last issue: Whether the District Court erred in finding that the numerous deferrals of principal payments and modifications of the original note did not release appellants as guarantors. If we were to find that the Court erred in so finding, appellants would be released without regard to the fact that the action was timely filed; however, we find no such error. As for the deferrals, the Court concluded that they "simply did not modify or alter the underlying contract, and in any event, the guaranty agreements expressly permitted such extensions." 629 F.Supp. at 584. The District Court also found that the record established the existence of only a single modification, rather than five as appellants asserted. In any event, the Court concluded that the number of modifications was irrelevant, for, "as previously noted [in the deferral discussion], the guaranty agreements specifically permitted the holder of the note to modify the terms, and ... defendants remained liable." *Id.* at 586.

Appellants' renewed contentions of release need detain us only briefly. They rely primarily on two cases where alterations of the original note released the note's guarantors: *Bank of Nova Scotia v. St. Croix Drive-In Theatre, Inc.*, 552 F.Supp. 1244 (D.V.I.1982), *aff'd*, 728 F.2d 177 (3d Cir.1984); and *Reliance Ins. Co. of Philadelphia v. Colbert*, 365 F.2d 530 (D.C. Cir.1966). These cases are quite clearly inapposite, as in neither case did the guarantors vest in the principal parties the right "to deal in any manner with the Liabilities and the collateral, including ... [the power to] modify or otherwise change any terms of all or any part of the Liabilities or ... to grant any extension or renewal thereof," J.A. A6, as was the case here. Where rights comparable to these are vested in the principals, the guarantor is not released by the contemplated alterations. *See, e.g., First Commercial Corp. v. Geter*, 37 Colo. App. 391, 547 P.2d 1291, 1294 (1976) ("Where the guaranty contract contains a provision which authorizes a change in the terms of the principal contract, a change within the scope of that authorization does not discharge a guarantor."). Indeed, 38 Am.Jur.2d *Guaranty* § 94 at 1100 (1968), speaks directly to the question before us:

A guarantor is bound by an agreement in the guaranty contract which permits extensions of time for the performance of the principal contract. When such an agreement is included in the guaranty contract, an extension of time within the intent of the agreement does not discharge the guarantor.

*Id.* (footnote omitted). Having vested these powers in the principals, appellants cannot claim that they were released by their exercise. *Cf. United States v. Warwick,* 695 F.2d 1063, 1070–71 (7th Cir.1982).

Appellants again argue that this broad grant of power was negated by a separate agreement which required their consent to alter the original note. However, we must reject the argument for the reasons discussed above. Appellants ask this Court to consider the difficulty of proving an agreement fifteen years after the fact. While we recognize the difficulty, to withstand a properly supported motion for summary judgment the nonmoving party must produce some evidence; after an adequate period of discovery, it is simply not enough to give a good reason for having none. *Cf. Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In sum, appellants failed in their obligation to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec.,* 475 U.S. at 587, 106 S.Ct. at 1356 (citations and emphasis omitted).

### III. CONCLUSION

Absent evidence that the guarantors' consent was required to modify the note, and given the guaranties' broad vesting of power to the holder to modify or extend the loan, we hold that the 1979 modification agreement effectively renewed the statute of limitations against the guarantors. Because this action was filed within six years of that extension, and because appellants were not released as guarantors, the judgment of the District Court is accordingly

*Affirmed.*